UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
MICHAEL WEIR; ELAINE WEIR; JENNIFER
STASUL; JOSE FRANCISCO; Individually and on
Behalf of All Others Similarly Situated,

                                     **OPINION & ORDER**

                Plaintiffs,

                                   16-CV-8650 (CS)

        - against -

CENLAR FSB, d/b/a CENTRAL LOAN
ADMINISTRATION & REPORTING; and CENLAR
AGENCY, INC.,

                   Defendants.
-------------------------------------------------------------------x

<u>Appearances</u>:
Rick S. Cowle
The Law Office of Rick S. Cowle P.C.
Carmel, New York
*Counsel for Plaintiffs*

Casey B. Howard
Locke Lord LLP
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

       Before the Court is the Motion to Dismiss of Defendants Cenlar FSB, d/b/a Central Loan

Administration & Reporting, and Cenlar Agency, Inc. (Doc. 20.) For the foregoing reasons,

Defendants' motion is GRANTED.

## I.      **BACKGROUND**

       For purposes of this motion, I accept as true the facts, but not the conclusions, set forth in

Plaintiffs' Amended Complaint. (Doc. 14 ("AC").)

## A.    <u>Facts</u>

This case arises out of Defendants' conduct in servicing Plaintiffs' mortgages.  Plaintiffs allege that Defendants participated in a scheme "aimed at maximizing automated fees assessed on [mortgage] borrowers' accounts who had fallen into arrears on their mortgages."  (*Id.* ¶ 1.) Defendants are one of the leading mortgage subservicing companies, and as of September 30, 2016, serviced approximately 2.3 million loans totaling $500 billion.  (*Id.* ¶¶ 2, 26.)  Plaintiffs bring this action on behalf of themselves and a class of similarly-situated persons, which is defined as "all persons who were charged computer-generated inspection fees by Defendants as a result of a late payment on their mortgage[s]."  (*Id.* ¶ 39.)  Plaintiffs do not know the class's exact size, but estimate that it is comprised of thousands of individuals across the United States. (*Id.* ¶ 41.)

Named Plaintiffs Michael and Elaine Weir (the "Weir Plaintiffs") purchased a home in Fishkill, New York, and the Security Instrument securing their mortgage with lender National City Mortgage, a division of National City Bank, was recorded on September 12, 2006.  (*Id.* ¶ 13; Doc. 22 ("Howard Decl.") Ex. A at 1-2.)[1]  Among its terms, the Instrument provides that "Lender, and others authorized by Lender, may enter on and inspect the Property.  They will do so in a reasonable manner and at reasonable times."  (Howard Decl. Ex. A at 9.)  The Instrument further stipulates that in the event of default, "Lender may charge . . . fees for services performed in connection with [] default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection, and valuation fees."  (*Id.* at 13.)

---

[1] I may consider Plaintiffs' mortgage agreements because they are integral to and referenced in the Amended Complaint, as discussed further below.

Named Plaintiffs Jennifer Stasul and Francisco Jorge ("Stasul/Jorge Plaintiffs") purchased a home in Carmel, New York and the Security Instrument securing their mortgage with lender 1st Alliance Lending, LLC was recorded on June 15, 2009. (AC ¶ 20; Howard Decl. Ex. B at 1.)[2] It provides that "Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default." (Howard Decl. Ex. B at 5.) It further provides that if the borrower misses payments, "Lender may do . . . whatever is necessary to protect the value of the property and Lender's rights in the property," and any amounts disbursed to do so "shall become an additional debt of Borrower." (*Id.* at 6.)

Both couples' mortgages were serviced by Defendants. (AC ¶¶ 13, 20.) Defendants are Cenlar FSB, which is alleged to be a loan servicing company, (*id.* ¶ 25), and Cenlar Agency, Inc., which is alleged to be a wholly owned subsidiary of Cenlar FSB and the instrumentality through which Cenlar FSB is authorized to do business in New York, (*id.* ¶¶ 25-28).

Over the life of their loans, Plaintiffs occasionally faced financial difficulty that caused them to miss payments. (*Id.* ¶¶ 14, 21.) When Plaintiffs failed to make timely payments, their monthly statements reflected additional amounts owed for late fees and inspections of their property. (*Id.* ¶¶ 15, 22.) For example, while they were working with Defendants on a loan modification and short sale of the premises, the Weir Plaintiffs were assessed inspection fees delineated as "FEE PROPERTY INSPECT" in the amount of $16.25. (*Id.* ¶ 16.) They were charged three such fees between April 22 and April 23, 2015. (*Id.* ¶ 17.) They were also charged for "Other Fees" ranging from approximately $120.00 to $275.00 per month, without further explanation. (*Id.*) The Stasul/Jorge Plaintiffs, who were also working with Defendants

---

[2] The body of the Amended Complaint says Ms. Stasul's husband is Francisco Jorge. (AC ¶ 20.) The caption of the Amended Complaint lists him as Jose Francisco. (*Id.* at 1.)

on a short sale of the property, were assessed numerous inspection fees also labeled "FEE PROPERY INSPECT" in amounts ranging from $15.00 to $20.00. (*Id.* ¶ 24.)[3] Plaintiffs allege upon information and belief that Defendants did not always inspect Plaintiffs' properties, but charged them for these inspections nonetheless. (*Id.* ¶¶ 18, 23.)

Plaintiffs allege that the charges for inspections and other fees were applied through "an unjust scheme undertaken by the Defendants to maximize profit[s] by ordering repetitive, unfair and excessive property inspections which are then charged to defaulted borrowers' accounts." (*Id.* ¶ 29.) Defendants manage and administer their servicing tasks with an automated computer software program called LoanSphere MSP, which was designed to, among other things, "manage borrowers' accounts and assess fees." (*Id.* ¶ 31.) If a borrower defaults on a loan, LoanSphere MSP will automatically order property inspections "without regard to actual need," (*id.*), and without an employee's determination that a property inspection is "reasonably necessary to protect [Defendants'] interests in the subject property," (*id.* ¶ 32.) The property inspections are "automatically ordered on a cyclical basis," "regardless of whether the property has been previously inspected, deemed occupied, well-maintained and in good condition," until the borrower is no longer in default. (*Id.* ¶ 33; *see id.* ¶ 34.) The inspections are completed by an inspector who drives by the property. (*Id.* ¶ 34.) Plaintiffs allege that the frequency of the property inspections is "excessive and neither reasonable nor appropriate," (*id.* ¶ 33), and that Defendants "knowingly misrepresented these unreasonable and excessive inspection fees . . . by portraying them as legitimate charges even though the Defendants knew that the inspections were not necessary to maintain or protect the properties or, at times, the inspections did not even occur," (*id.* ¶ 36).

---

[3] Paragraph 24 of the Amended Complaint refers to "Ms. Stasul and Mr. Ferdico." (AC ¶ 24.) This is the only reference to Mr. Ferdico in the Amended Complaint. I assume that Plaintiffs mean to refer to Mr. Jorge.

## B. **Procedural History**

Plaintiffs commenced this action on November 7, 2016. (*See* Doc. 1.) On March 13, 2017, Defendants filed a letter seeking a pre-motion conference to discuss their anticipated motion to dismiss. (Doc. 10.) Plaintiffs responded on April 10, 2017, (Doc. 13), and the parties appeared for a pre-motion conference to discuss the proposed motion on April 17, 2017, (Minute Entry dated Apr. 17, 2017). At that conference, the Court granted Plaintiffs leave to amend, and Plaintiffs filed their Amended Complaint on June 16, 2017, bringing seven causes of action. (Doc. 14.) Counts One and Two allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (a), and Count Three alleges a conspiracy to violate RICO pursuant to 18 U.S.C. § 1692(d). Plaintiffs allege that Defendants, including their directors, employees and agents, along with their property inspection vendors, formed an association-in-fact enterprise (the "Cenlar Enterprise"), and violated § 1962(c) through mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, by charging Plaintiffs unnecessary fees. (AC ¶¶ 48-83.) Plaintiffs further allege that the income Defendants received from their scheme was reinvested to finance the continuing racketeering activity, violating 18 U.S.C. § 1962(a) (*id.* ¶¶ 84-87), and that Defendants conspired to violate §§ 1962(a) and (c), (*id.* ¶¶ 88-93).

Plaintiffs also bring claims for (1) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e(2), (10); (2) violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2605, 2607; (3) violation of New York General Business Law ("N.Y. G.B.L.") § 349(g); and (4) unjust enrichment. (AC ¶¶ 94-127.) In addition to federal question jurisdiction, Plaintiffs assert subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2), known as the Class Action Fairness Act of 2005, Pub. L. 109-2 § 7, 119 Stat. 13 ("CAFA"). (AC ¶¶ 8, 11.)

Defendants filed their motion on December 15, 2017. (Doc. 20.) They argue that: (1) Plaintiffs' RICO claims should be dismissed because they fail to plausibly allege a RICO enterprise, a fraudulent misrepresentation, or an injury; (2) Plaintiffs' FDCPA claim fails because Plaintiffs have not plausibly alleged a misrepresentation or deception, or that Defendants are debt-collectors; (3) Plaintiffs' RESPA claim is barred by a one-year statute of limitations and the claim arose after the "inception of a mortgage," taking it outside the purview of the statute; (4) the N.Y. G.B.L. § 349 claim fails because Plaintiffs have not pleaded any deceptive or misleading act and do not address a "consumer-oriented" practice; and (5) Plaintiffs' unjust enrichment claim is improper because there is a contract governing the relevant issues. (*See* Doc. 21 ("Ds' Mem.").)

Plaintiffs respond that they have adequately pleaded the alleged enterprise as consisting of Defendants and their inspection vendors; that, by charging Plaintiffs for "FEE PROPERTY INSPECT," Defendants "create[d] the belief that the automatic and repetitive property inspections [were] reasonable and necessary to protect the lender's security" and that Defendants therefore fraudulently misrepresented "the true nature" of the fees as unreasonable and unnecessary to ensure the houses were occupied; and that they have adequately alleged claims under the FDCPA and N.Y. G.B.L. § 349, and for unjust enrichment. (Doc. 24 ("Ps' Opp.") at 7, 10-11, 15-25.)[4]

---

[4] Plaintiffs fail to respond to Defendants' arguments for dismissal of the RESPA claims. "At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim." *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014); *see, e.g.*, *Silverman v. Miranda*, 116 F. Supp. 3d 289, 303 (S.D.N.Y. 2015); *Bonilla v. Smithfield Assocs. LLC*, No. 09-CV-1549, 2009 WL 4457304, at *4 (S.D.N.Y. Dec. 4, 2009). Because Plaintiffs failed to address Defendants' arguments, their claims under RESPA are dismissed.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6) Motion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to

relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).[5]

**B.** **Documents Properly Considered**

When deciding a motion to dismiss, a court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint . . . , and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted). To be incorporated by reference, the complaint must make "a clear, definite and substantial reference to the documents." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (internal quotation marks omitted). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect. Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotation[s] from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (alteration in original) (citation and internal quotation marks omitted).

Defendants attach to their counsel's declaration the Weir Plaintiffs' Security Instrument, (Howard Decl. Ex. A), and the Stasul/Jorge Plaintiffs' Security Instrument, (*id.* Ex. B). Plaintiffs attach the same documents, (Ps' Opp. Exs. C, D), as well as affidavits from the Weir Plaintiffs and the Stasul/Jorge Plaintiffs, (*id.* Ex. B). I may consider the Security Instruments because they are referenced in and integral to the Amended Complaint, (*see* AC ¶¶ 13, 20). *See Vaccaro v. Bank of Am., N.A.*, No. 13-CV-2484, 2016 WL 4926201, at *1 n.1 (S.D.N.Y. Sept. 15, 2016)

---

[5] Plaintiffs cite the outdated "no-set-of-facts" motion to dismiss standard. (Ps' Opp. at 5.) This "no set of facts" standard was "retire[d]" by *Twombly* in 2007. *See Twombly*, 550 U.S. at 563. Nobody should be citing it any longer.

(collecting cases). I cannot consider Plaintiffs' affidavits, however, as "[c]ourts ordinarily do not consider factual assertions contained in affidavits submitted in support of or opposition to a motion to dismiss." *Colliton v. Bunt*, No. 15-CV-6580, 2016 WL 7443171, at *5 (S.D.N.Y. Dec. 27, 2016), *aff'd*, 709 F. App'x 82 (2d Cir. 2018); *see Faulkner v. Beer*, 463 F.3d 130, 134 n.1 (2d Cir. 2006) (collecting cases).

## III. DISCUSSION

### A. RICO Claims

Plaintiffs bring claims under three RICO provisions: 18 U.S.C. § 1962(c) (Count One); 18 U.S.C. § 1962(a) (Count Two); and 18 U.S.C. § 1962(d) (Count Three).

Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To state a claim under § 1962(c), a plaintiff must plausibly allege that a defendant engaged in (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity (5) resulting in (6) injury to business or property. *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999). The requirements of § 1962(c) must be established as to each individual defendant. *De Falco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).

"[A] claim under § 1962(a) has two elements: (1) that the defendant received income from a pattern of racketeering activity; and (2) that the plaintiff was directly harmed by the defendant's use or investment of that income." *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 448 (S.D.N.Y. 2004). The injury must come from the defendant's "investment of racketeering income in an enterprise," not from the predicate acts alone.

*Ouaknine v. MacFarlane*, 897 F.2d 75, 82-83 (2d Cir. 1990)).  Section 1962(d), known as RICO conspiracy, provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of" the RICO statute.  18 U.S.C. § 1962(d).

Defendants argue that Plaintiffs' civil RICO claims fail for three primary reasons:  (1) the members of the enterprise do not share a common purpose; (2) the alleged enterprise is not distinct from its alleged pattern of racketeering; and (3) Plaintiffs failed to plausibly plead a misrepresentation, which is a necessary element of mail and wire fraud.  (Ds' Mem. at 6-18.)  I agree, and thus all of Plaintiffs' civil RICO claims are dismissed.[6]

> 1.  Cenlar Enterprise

A RICO "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  As the Supreme Court has explained,

> [t]he enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. . . .  [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. . . .  The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages.  The existence of an enterprise at all times remains a separate element which must be proved . . . .

*United States v. Turkette*, 452 U.S. 576, 583 (1981); *accord First Capital Asset Mgmt., Inc. v. Satinwood, Inc*., 385 F.3d 159, 173 (2d Cir. 2004).  The "enterprise" is distinct from the "person[s]" who participate in the conduct of its affairs.  *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2002) ("[T]o establish liability under § 1962(c) one must allege and

---

[6] Defendants raise other arguments for dismissal of Plaintiffs' RICO claims, but because the issues regarding the pleaded enterprise and misrepresentations are dispositive, I will not discuss Defendants' remaining arguments.

prove the existence of two distinct entities:  (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.").

a.      *Common Purpose and Distinctness*

Plaintiffs allege that the Cenlar Enterprise is an association-in-fact enterprise that consists of Defendants, including their directors, employees and agents, along with their property inspection vendors.  (AC ¶¶ 55-62; Ps' Opp. at 11-12.)  The alleged ultimate aim of the enterprise is to "maximiz[e] their profits by charging unnecessary and repeated default-related fees to Plaintiffs and [c]lass members."  (AC ¶ 58.)  By Plaintiffs' account, Defendants made false and misleading statements by failing to disclose that the inspections for which they were charged were unreasonable (or perhaps not performed).  (Ps' Opp. at 10-11.)  Plaintiffs argue that the vendors and Defendants shared a common purpose of "maximizing profits by ordering unreasonable and unnecessary inspections and imposing excessive fees on the mortgagors who are already burdened by financial obligations they cannot meet."  (*Id.* at 11.)

As in *Tardibuono-Quigley v. HSBC Mortg. Corp. (USA)*, No. 15-CV-6940, 2017 WL 1216925, at *6 (S.D.N.Y. Mar. 30, 2017), which is nearly factually identical to this case, Plaintiffs do "not allege that these third-party vendors own or service mortgages, developed the guidelines for imposing the default-related services, ordered any of the services, or invoiced the borrowers for the services they performed."  There, as here, "[t]he vendors' only role in the alleged enterprise was responding to the automatically-generated work orders.  They had no say in when or how those services would be charged to Plaintiff."  *Id.*  As in *Tardibuono-Quigley*, nothing in the Amended Complaint here suggests that the property inspection vendors "knew that [Defendants'] activities were unnecessary or in breach of contract."  *Id*.  In fact, the vendors are mentioned in only four paragraphs of the Amended Complaint, (AC ¶¶ 57, 60, 61, 109), only

two of which explain the vendors' role in the alleged enterprise, (*see id.* ¶¶ 60, 61). Plaintiffs allege that:

> Defendants control and operate the Cenlar Enterprise as they, *inter alia*, establish computer program guidelines that automatically order property inspections by vendors with respect to loans deemed in default without regard to whether such property inspection are necessary; send out vendors to inspect the property regardless of the necessity of said inspections; arrange the uploads of property inspection reports to the automated system; assess fees to borrowers for the unnecessary and repeated property inspections; send statements to the borrowers that are misleading as to the nature of the charged default-related fees; collect payments from said borrowers that include inspection fees; and pay vendors for each property inspection completed using funds received from borrowers.

(*Id.* ¶ 60.) They further allege that the LoanSphere MSP computer system "is a common communication network by which Defendants and the vendors share information," and allow "Defendants to charge Plaintiffs and Class members unreasonable, excessive and improper fees and to gain from the resulting profits." (*Id.* ¶ 61.) Nothing in these allegations suggests that the vendors were aware that the inspections might have been unnecessary, that the costs were passed on to the borrowers, or that that might breach the relevant contracts. To the contrary, Plaintiffs specifically allege that it was Defendants who created the scheme and directed the vendors to inspect properties via an automated computer system. Thus, the vendors do not plausibly share a common purpose with Defendants and cannot help form an enterprise for purposes of civil RICO. *See Tardibuono-Quigley*, 2017 WL 1216925, at *6; *see also Cirino v. Bank of Am., N.A.*, No. 13-CV-8829, 2014 WL 9894432, at *10 (C.D. Cal. Oct. 1, 2014) (RICO claim dismissed where plaintiffs failed to plead that property preservation vendors had common purpose with bank defendant because the former "merely carry out the inspections ordered by Defendants").

Plaintiffs argue – but do not allege in their Amended Complaint – that "[t]hird party vendors have been used as the instrumentality in furtherance of the enterprise's purposes, each unjustly profiting off the backs of unsuspecting borrowers who are already experiencing

financial distress." (Ps' Opp. at 11.) A plaintiff may not amend the complaint via a memorandum of law, *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005), but in any event, being an "instrumentality" does not thereby mean one shares a common purpose. Defendants allegedly used the mail in furtherance of the scheme, but that would not make the Postal Service of a member of the enterprise.

Plaintiffs rely on *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006 (S.D. Iowa 2009), for the proposition that an association-in-fact enterprise exists because Defendants directed the property vendors to engage in proscribed conduct. (Ps' Opp. at 11-12.) There, the court held that "[t]he Complaint sets forth that Wells Fargo and the property inspection vendors formed an association-in-fact enterprise which fulfills the statutory requirements of a RICO enterprise," and noted that "Congress clearly intended RICO liability to extend to situations where one entity directs the formation of a RICO enterprise and then makes use of the association to further a pattern of unlawful activity." *Young*, 671 F. Supp. 2d at 1028. Under this circular reasoning, one entity (*e.g.*, Cenlar FSB) could direct the formation of a RICO enterprise (the Cenlar Enterprise) consisting of itself and third parties (the vendors) even if the latter were unaware of the purpose for which they were joined. *Young* quoted the Supreme Court to the effect that RICO "protects the public from those who would unlawfully use an 'enterprise' . . . as a 'vehicle' through which unlawful activity is committed," *id.* at 1029 (quoting *Cedric Kushner Promotions*, 533 U.S. at 164-65)), but it then seemingly equated the vendors with the enterprise without analyzing whether they shared a common purpose with Wells Fargo, the other member of the enterprise. In so doing, it overlooked not only the common purpose requirement but also that "[t]he enterprise must consist of at least two entities, and must be more than the RICO defendant 'referred to by a different name.'" *Cirino*, 2014 WL 9894432, at *9 (quoting *Cedric*

*Kushner Promotions*, 533 U.S. at 161)); *cf. Tardibuono-Quigley*, 2017 WL 1216925, at *7 (enterprise plausibly pleaded notwithstanding vendors' lack of common purpose because there were other alleged members – including bank and servicer – who shared common purpose in fraudulent scheme). In other words, while Plaintiffs may be right that the "[t]hird party vendors [were] used as the instrumentality in furtherance of the enterprise's purposes," (Ps' Opp. at 11), that does not make the vendors members of the enterprise.

With the vendors out of the picture as enterprise members, the only remaining entities in the alleged enterprise are Cenlar FSB, Cenlar Agency, and their directors, employees and agents. (AC ¶ 57.) "Second Circuit law . . . holds that a corporation acting in concert and in the ordinary course of business with its agents and employees is not a RICO enterprise, whether or not the agents are external or internal to the corporation," even where that business is alleged to be fraudulent. *In re: Gen. Motors LLC Ignition Switch Litig.*, Nos. 14-MD-2543, 14-MC-2543, 2016 WL 3920353, at *13 (S.D.N.Y. July 15, 2016) (collecting cases); *see U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 206 (2d Cir. 2017) ("[A] plaintiff may not circumvent the distinctness requirement by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant . . . .") (internal quotation marks omitted), *cert. denied*, 138 S. Ct. 1559 (2018); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (corporation, chief operating officer and corporate counsel could not form enterprise because complaint merely alleged COO and counsel carried out "the regular affairs of [the corporation], such as day-to-day financial operations, including the implementation and supervision of deceptive trading practices") (internal quotation marks omitted). And while a corporate agent or employee can be a "person" who conducts the affairs of the corporate "enterprise," *Cedric Kushner Promotions*, 533 U.S. at

164, there are no allegations regarding any specific officer or employee responsible for the allegedly fraudulent acts, *In re Parlamat Sec. Litig.*, 479 F. Supp. 2d 332, 347 (S.D.N.Y. 2007) ("[R]eference to unnamed attorneys, accountants and other agents as part of the enterprise cannot be the basis for the distinction between a corporate person and an enterprise.") (alteration in original) (internal quotation marks omitted), and no such individual is named as a "person" conducting the affairs of the enterprise here.

Further, the enterprise cannot consist of Cenlar FSB and Cenlar Agency because Plaintiffs allege that Cenlar Agency is a wholly owned subsidiary of Cenlar FSB "sharing a common office space and common officers with Cenlar [FSB]." (AC ¶ 27.) "[W]holly owned subsidiaries are not distinct from their parent company for the purposes of alleging a RICO enterprise." *Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 78 (E.D.N.Y. 2011); *see Cruz*, 720 F.3d at 121 (wholly-owned subsidiary not distinct from enterprise consisting of itself and parent because allegations showed only two entities "operate[d] as part of a single, unified corporate structure"); *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) ("It would be inconsistent for a RICO person, acting within the scope of its authority, to be subject to liability simply because it is separately incorporated . . . ."), *vacated on other grounds by* 525 U.S. 128 (1998).[7] Thus, the alleged Cenlar Enterprise is not distinct from the alleged RICO persons, Cenlar FSB and Cenlar Agency.[8]

---

[7] If Cenlar Agency and Cenlar FSB were alleged to serve different roles within the Cenlar Enterprise, Plaintiffs might have plausibly pleaded the distinctness requirement. *Cf. U1it4less*, 871 F.3d at 207 (enterprise not distinct from persons in part because "no evidence show[ed] that any FedEx entity operated outside of a unified corporate structure guided by a single corporate consciousness"). Here, however, the Amended Complaint provides no allegations that Cenlar FSB and Cenlar Agency were anything other than "a unified corporate structure guided by a single corporate consciousness." *Id.* Indeed, there are no allegations that Cenlar Agency acted in any role independent either from the alleged Cenlar Enterprise or Cenlar FSB, and essentially no allegations indicating Cenlar Agency's role in the scheme at all.

[8] The cases upon which Plaintiffs rely do not convince me otherwise. In each of the cases, the plaintiffs plausibly pleaded that multiple entities and/or persons made up the alleged enterprise. *See State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14-CV-9792, 2015 WL 4104840, at *1, *2 (S.D.N.Y. June 18, 2015) (enterprise comprised of various

### b. Pattern

Even if Plaintiffs plausibly pleaded that the Cenlar Enterprise was distinct from the alleged RICO persons, they have failed to allege that it is distinct from the pattern of fraudulent conduct. The non-existence of "an enterprise that is separate and distinct from the fraudulent . . . scheme allegedly engaged in by the Defendants . . . is fatal to Plaintiffs' RICO claim." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 458-59 (S.D.N.Y. 2009). An enterprise is not separate or distinct from the fraudulent scheme if the members "came together strictly for the purpose of creating these allegedly fraudulent" schemes. *Id.* at 459. Plaintiffs offer no response to Defendants' argument that, even if the vendors were part of the alleged enterprise, it is not separate from the alleged fraudulent scheme. The Amended Complaint lacks even a conclusory allegation as to how the alleged enterprise has an existence apart from the pattern of racketeering activity, and there is nothing in the Amended Complaint to suggest that Cenlar and the vendors came together for some purpose other than conducting the inspections underlying the scheme.

Consequently, "[t]he enterprise and the pattern in this case are one and the same," and the lack of a separate enterprise is fatal to the RICO claims. *Kottler*, 607 F. Supp. 2d at 459 (dismissing RICO claim because "allegations in the Amended Complaint fall short of alleging a RICO enterprise that existed separate and apart from any pattern of racketeering activity in which the Defendants and co-conspirators engaged"); *see Eaves v. Designs for Fin., Inc.*, 785 F.

---

entities that operated out of shared medical facility); *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 699 (S.D.N.Y. 2015) (enterprise consisted of owner, his company, subsidiary, and law firm); *Fuji Photo Film U.S.A., Inc. v. McNulty*, No. 05-CV-7869, 2009 WL 3334867, at *3 (S.D.N.Y. Oct. 14, 2009) (reaffirming earlier holding that plaintiff had plausibly pleaded an association-in-fact enterprise consisting of defendant, company at which he held managerial positions and vendors controlled by his friends and family who cooperated among themselves) (citing *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 314 (S.D.N.Y. 2009)); *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 941 (N.D. Cal. 2013) (Wells Fargo and affiliated entity, Premiere Asset Services, a middleman company that dealt with vendors, were members of alleged enterprise). Here, however, the only two possible members of the Cenlar Enterprise are Cenlar FSB and Cenlar Agency, and the latter is a wholly-owned subsidiary of the former. Thus, the cases Plaintiffs cite are inapposite.

Supp. 2d 229, 263 (S.D.N.Y. 2011) (RICO claims failed where complaint did not allege association-in-fact that existed separate and apart from alleged racketeering activity); *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89, 97-98 (S.D.N.Y. 1993) (dismissing RICO claim where plaintiff alleged that "at various times as early as 1985, and possibly earlier . . . defendants were associated in fact for the common purpose, among others, of defrauding [plaintiff] through the loan transactions described in this complaint and other means" and that "[t]his association in fact was an 'enterprise,'" because "[c]onclusory allegations that disparate parties were associated in fact . . . are insufficient to sustain a RICO claim, absent allegations as to how the members were associated together in an 'enterprise'"), *aff'd*, 27 F.3d 763 (2d Cir. 1994).

Because Plaintiffs fail to plausibly allege that the property inspection vendors shared a common purpose, that the Cenlar Enterprise is distinct from the alleged RICO persons, and that the enterprise is distinct from its pattern of conduct, Plaintiffs' substantive RICO claims fail.[9]

## B.     FDCPA

Defendants argue that Plaintiffs do not sufficiently plead that Defendants are debt collectors within the meaning of the FDCPA.  I agree.  A "debt collector" is one "who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or

---

[9] The claim under Section 1962(a) fails because, as discussed, the enterprise is insufficiently pleaded, and for the additional reason that Plaintiffs do not allege that they suffered any injury from Defendants' reinvestment of their racketeering income.  *See Ouaknine*, 897 F.2d at 82-83.  With respect to Plaintiffs' RICO conspiracy claim, "Section 1962(d) prohibits any person from conspiring to violate any of the substantive provisions of subsections § 1962(a)-(c)."  *Crabhouse of Douglaston*, 801 F. Supp. 2d at 89; *see* 18 U.S.C. § 1962(d).  To adequately plead a claim of conspiracy to violate RICO, the underlying substantive claim must also be adequately pleaded.  *See Tardibuono-Quigley*, 2017 WL 1216925, at *14 (RICO conspiracy claim necessarily fails where underlying substantive claim fails) (collecting cases); *Crabhouse of Douglaston*, 801 F. Supp. 2d at 89 (same).  Accordingly, Plaintiffs' failure to plead a substantive RICO claim, as discussed above, necessarily means that their conspiracy claim is inadequately pleaded and must be dismissed as well.

indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).

Plaintiffs allege in entirely conclusory terms that Defendants are debt collectors, (AC ¶ 97), but present no facts rendering that allegation plausible. "A mortgage servicer is a 'debt collector' within the meaning of the FDCPA if the mortgage was in default at the time the servicer began servicing the debt," but "where a mortgage servicer obtains a loan that is not in default, it is not a debt collector within the meaning of the FDCPA." *Zirogiannis v. Seterus, Inc*., 221 F. Supp. 3d 292, 302 (E.D.N.Y. 2016) (collecting cases), *reconsideration denied*, No. 15-CV-5884, 2017 WL 5508725 (E.D.N.Y. Jan. 13, 2017), *aff'd*, 707 F. App'x 724 (2d Cir. 2017) (summary order). Plaintiffs do not allege that Defendants became involved only after Plaintiffs' mortgages were in default; to the contrary, the Amended Complaint suggests that, if anything, the mortgages were serviced by Defendants from inception. (AC ¶¶ 13, 20.) Because "the Court is unable to conclude that the [Amended Complaint] contains enough facts to make it plausible that [Defendants] began servicing the [relevant mortgages] only after the [Plaintiffs'] default," *Kilpakis v. JPMorgan Chase Fin. Co., LLC*, 229 F. Supp. 3d 133, 143 (E.D.N.Y. 2017) (emphasis omitted), and because it is thus not plausible that they are "debt collector[s]" within the meaning of the FDCPA, the FDCPA claim is dismissed.

Moreover, even if Defendants were debt collectors under the statute, the claim would still fail. The FDCPA proscribes debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. "Congress enacted [the] FDCPA . . . to eliminate abusive debt collection practices by debt collectors . . . ." *Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 193 (2d Cir. 2015) (internal quotation marks omitted). "It was designed to protect consumers from unscrupulous collectors whether or not there is a valid debt." *Forman v. Acad. Collection Serv., Inc.*, 388 F.

Supp. 2d 199, 202 (S.D.N.Y. 2005). Plaintiffs allege that Defendants violated two subdivisions of Section 1692e: (1) § 1692e(2), which prohibits a "false representation of the character, amount, or legal status of any debt; or any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt;" and (2) § 1692e(10), which makes it a violation to "use . . . any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

In considering whether a collection notice violates § 1962e, the Second Circuit applies the "least sophisticated consumer" standard. *See Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993). This standard "ensure[s] that the FDCPA protects all consumers, the gullible as well as the shrewd." *Id.* "The hypothetical least sophisticated consumer does not have the astuteness of a . . . lawyer or even the sophistication of the average, everyday, common consumer, but is neither irrational nor a dolt." *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) (internal quotation marks omitted). The least sophisticated consumer inquiry "is to be conducted with a recognition that confusion can occur in . . . myriad . . . ways, such as when a letter visually buries the required validation notice, contains logical inconsistencies, fails to explain an apparent inconsistency, or presents some combination of these (or similar) vices." *Pollard v. Law Office of Mandy L. Spaulding*, 766 F.3d 98, 104 (1st Cir. 2014).

Plaintiffs' theory of misrepresentation is that "[b]y issuing mortgage statements to Plaintiffs and Class members, Defendants represented to the Plaintiffs and Class members that all amounts due on these statements were lawful and reasonable," and thus Defendants "misrepresented to Plaintiffs and Class members in their monthly mortgage statements that all fees, charges and amounts due were lawful and proper." (AC ¶ 69.) Plaintiffs identify three types of transactions they consider fraudulent: (1) charges ranging from $15.00 to $20.00 listed

as "FEE PROPERTY INSPECT" for which inspections were completed, (*id.* ¶¶ 17, 24); (2) charges listed as "FEE PROPERTY INSPECT" for which Plaintiffs were charged but an inspection was allegedly never completed, (*id.* ¶¶ 18, 23); and (3) charges for "Other Fees" in amounts ranging from $120.00 to $275.00 per month, (*id.* ¶ 17). In the event of a default, the Weir Plaintiffs' Security Instrument permits the lender to enter on and inspect the property "in a reasonable manner and at reasonable times," and to "charge . . . fees for services performed in connection with [] default . . . including, *but not limited to*, attorneys' fees, property inspection and valuation fees." (Howard Decl. Ex. A at 9, 13 (emphasis added).) Similarly, the Stasul/Jorge Plaintiffs' Security Instrument allows, in the event of default, property inspections and action necessary to protect the property, the costs of which "shall become an additional debt of [the] Borrower." (*Id.* Ex. B at 5-6.)

Few courts have considered whether charging mortgagors for allegedly unreasonable property inspections or other fees in the event of default, and accurately listing these charges on the bill, amounts to an FDCPA violation. *See, e.g.*, *Vega v. Ocwen Fin. Corp.*, No. 14-CV-4408, 2015 WL 1383241, at *6 (C.D. Cal. Mar. 24, 2015); *Benner v. Bank of Am., N.A.*, 917 F. Supp. 2d 338, 353-54 (E.D. Pa. 2013). The logic regarding misrepresentation as an element of mail or wire fraud pleaded as a predicate act for civil RICO, however, is persuasive here. With respect to the first and third categories listed above, Plaintiffs argue that "they were not expressly obligated under the mortgage agreement to pay for the inspection fees charged" because the inspections were "automatic and repetitive" and unreasonable. (Ps' Opp. at 17.) The alleged deception, according to Plaintiffs, is the charging of unreasonable fees and the failure to disclose that the fees were not reasonable and Plaintiffs were therefore not obligated to pay. (*Id.*) In *Tardibuono-Quigley*, this Court rejected in the civil RICO context an identical argument that

"Defendants committed fraud by omitting a material fact, i.e., failing to disclose that the assessed fees were unnecessary," and considered whether charges listed as "AUTO PPTY INSPEC" constituted mail or wire fraud. 2017 WL 1216925, at *3, *11. Relying on an analogous out-of-Circuit case that applied similar reasoning to RICO and FDCPA claims, the Court held that charges for property inspections did not amount to misrepresentations because the plaintiffs'

> "mortgage agreement explicitly authorizes property inspections and [their] monthly bill[s] while [they were] in default disclosed that [they were] charged for such inspections. While there may be a *disagreement* regarding the terms in the mortgage agreement, and whether the property inspections were 'reasonable' under the mortgage agreement, a mere disagreement does not create additional liability. The failure to concede liability in a billing statement does not then create additional causes of action. It would be absurd for [defendants] to print 'unnecessary property inspection' on each billing statement. There is no wrongdoing in [plaintiffs'] billing statement[s] because [defendants] did not concede breach of contract liability."

*Tardibuono-Quigley*, 2017 WL 1216925, at *11 (emphasis in original) (quoting *Vega v. Ocwen Fin. Corp.*, No. 14-CV-4408, 2015 WL 1383241, at *6 (C.D. Cal. Mar. 24, 2015)).

Similarly here, Plaintiffs' statements included charges for property inspections and "Other Fees," both of which were permitted in the event of default under the Security Instruments. Property inspections are explicitly permitted under the Security Instrument, (*see* Howard Decl. Ex. A at 9; *id.* Ex. B at 5), and the Weir Plaintiffs' instrument clearly permits other fees that are incurred as a result of default, (*see id.* Ex. A at 10, 13).[10] That Plaintiffs believe – perhaps justifiably so – that Defendants took advantage of those provisions in their mortgage agreements and charged for excessive and unreasonable property inspections does not mean that labeling them for what they were – property inspections and other fees – amounts to false representations. *See Tardibuono-Quigley*, 2017 WL 1216925, at *13 ("Defendants did not

---

[10] Plaintiffs allege that only the Weirs were charged "Other Fees" in amounts higher than the property inspections, (*see* AC ¶ 17), from which it can be inferred that the "Other Fees" were for some other charge related to default.

misrepresent the nature of the fees in any billing statements . . . .").  Nor do Plaintiffs "allege that Defendants charged borrowers any amount in excess of the cost of the inspections . . . ."  *Id.*  Thus, without any allegations that Defendants concealed or inflated the charges for property inspection or "Other Fees," Plaintiffs have failed to plausibly plead an FDCPA violation with respect to the property inspections that were actually performed or the "Other Fee" charges.  *See Vega*, 2015 WL 1383241, at *14-15 ("[E]very pending case involving property inspection fees includes allegations that the mortgage servicer concealed the fees on the billing statement."); *see also Benner*, 917 F. Supp. 2d at 354 (dismissing § 1692e(2) claim because plaintiff's mortgage explicitly allowed for property inspections in event of default).

Regarding the second category listed above – fees charged as "FEE PRPOERTY INSPECT" but for which no inspection was allegedly performed – the Amended Complaint contains insufficient facts rendering it plausible that Plaintiffs were charged for inspections that never occurred.  (*See* AC ¶¶ 18, 23.)  Plaintiffs merely repeat that "upon information and belief," the vendors did not inspect the properties, (*see* AC ¶¶ 18, 75), and opine that "it is suspect whether inspections actually [took] place," (*see id.* ¶ 34), without any support aside from the fact that Defendants knew the houses were occupied because the parties were working on short sales, (*id.* ¶¶ 16, 24), which in Plaintiffs' view renders the inspections unnecessary or unreasonable.[11]

---

[11] In their affidavits in opposition to the instant motion, the Weir Plaintiffs allege that even though they both spent most of their time at home during the relevant period, they never saw a bank representative or inspector come to their home or drive by taking pictures.  (Ps' Opp. Ex. B at 2 ¶¶ 6, 9.)  Similarly, the Stasul/Jorge Plaintiffs allege that an inspector came to their door once in 2015, but no other inspector has come to their property "to [their] knowledge."  (*Id.* Ex. B at 3-4 ¶¶ 4-5.)  As previously discussed, I cannot consider these affidavits on a motion to dismiss.  *See supra* Section II.B.  Even if I could, Plaintiffs allege in their Amended Complaint that the property inspections are "mere 'drive-by' inspections, where the inspector drives by the property ostensibly to assess whether the house is occupied, is being maintained and has not been damaged."  (AC ¶ 34.)  There are no allegations in the Amended Complaint that the inspectors were tasked with coming to the door or taking pictures of the homes, so if the inspectors were merely driving by the homes for inspection, it is unlikely that Plaintiffs would know whether the inspections were completed or not, unless they were looking out the window all day and the inspectors' cars were somehow identifiable.

But given that the alleged purpose of the inspections included ascertaining if the property was being maintained or had been damaged, and the likelihood that occupants who are having trouble paying their mortgage might also have trouble keeping up or repairing their property, the mere fact that the property was occupied does not alone render an inspection irrational – and surely does not show that an inspection never took place.[12]

Therefore, because Plaintiffs fail to plausibly plead a misrepresentation or that Defendants are debt collectors, their FDCPA claims are dismissed.[13]

## C.     State Law Claims

### 1.     CAFA

Ordinarily, having dismissed all federal claims, I would decline to exercise supplemental jurisdiction over the state claims. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (citing 28 U.S.C. § 1367(c)(3)). But Plaintiffs allege that this Court has subject-matter jurisdiction over the state claims under CAFA. (AC ¶ 11.) Defendants argue that Plaintiffs

---

[12] The closest Plaintiffs come to providing facts suggesting that inspections never took place is their allegation that the Weir Plaintiffs were charged for three property inspections on April 22 and 23, 2015. (*Id.* ¶ 17.) Three inspections in two days does indeed seem unnecessary and excessive, so much so that one might surmise that they did not all really occur. But the allegation is not that three inspections occurred in two days; rather it is that Defendants billed for three inspections on two dates. Given the absence of any indication that the billing date and the inspection date are necessarily the same, and given that the allegation is a one-off event which could have other plausible explanations (such as belated billing by the vendor), the allegation regarding April 22 and 23, 2015 is insufficient to nudge the allegation that the inspections did not take place "across the line from conceivable to plausible . . . ." *Twombly*, 550 U.S. at 570.

[13] Even if Plaintiffs' RICO claims did not fail due to their failure to plausibly plead an enterprise, their RICO claims would fail for the same reason as their FDCPA claims – that is, for failure to plead a misrepresentation. *See Tarduono-Quigley*, 2017 WL 1216925, at *13 ("[T]he gravamen of Plaintiff's RICO claims is that HSBC Mortgage breached the Security Agreement by charging fees for unnecessary property inspections . . . . This conduct, however, does not amount to a RICO violation. Defendants did not misrepresent the nature of the fees in any billing statements, and Plaintiff does not allege that Defendants charged borrowers any amount in excess of the cost of the inspections . . . ."); *Vega*, 2015 WL 1383241, at *6, *13 (dismissing RICO claim for failure to plead predicate act of mail or wire fraud and noting that "[w]hile there may be a disagreement regarding the terms in the mortgage agreement, and whether the property inspections were 'reasonable' under the mortgage agreement, a mere disagreement does not create additional liability"); *see also Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 576 (S.D.N.Y. 2016) ("The defendants did not owe the plaintiffs some legal duty beyond the obligations contained within the contracts, and the defendants made no misrepresentation collateral or extraneous to the contract.") (internal quotation marks omitted).

failed to plead that their claims would amount to $5 million in damages, as required under

CAFA. (Ds' Mem. at 23 n.5.) Plaintiffs fail to respond to this argument in their opposition

brief, and thus I could deem it abandoned. *See Romeo & Juliette Laser Hair Removal*, 2014 WL

4723299, at *7. But the Court has an "independent obligation to determine whether subject

matter jurisdiction exists," *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010); *see Halperin v. Int'l

Web Servs., LLC*, 70 F. Supp. 3d 893, at 904-05 (N.D. Ill. 2014) (undertaking independent

analysis of subject matter jurisdiction under CAFA), so I turn to the merits.

"To establish federal jurisdiction under CAFA, [the party asserting jurisdiction] 'must

prove to a reasonable probability' that (1) there is minimal diversity (meaning at least one

defendant and one member of the putative class are citizens of different states); (2) the putative

class exceeds 100 people; and (3) the amount in controversy is greater than $5 million." *Fields

v. Sony Corp. of Am.*, No. 13-CV-6520, 2014 WL 3877431, at *1 (S.D.N.Y. Aug. 4, 2014)

(quoting *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 59 (2d Cir. 2006)). Defendants take issue

with the third requirement – that Plaintiffs have proven to a reasonable probability that their

claims exceed $5 million. (Ds' Mem. at 23 n.5.)

"[T]he claims of the individual class members shall be aggregated to determine whether

the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and

costs." *Fields*, 2014 WL 3877431, at *2; 28 U.S.C. § 1332(d)(6). Courts have held that "[i]n

satisfying the 'reasonable probability' burden, there is 'a rebuttable presumption that the face of

the complaint is a good faith representation of the actual amount in controversy,'" *Hart v. Rick's

NY Cabaret Int'l, Inc.*, 967 F. Supp. 2d 955, 961 (S.D.N.Y. 2014) (quoting *Colavito v. N.Y.

Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006)), and that to overcome that

presumption, Defendants must show that the complaint "was so patently deficient as to reflect a

legal certainty that the plaintiff could not recover the amount alleged . . . ," *Colavito*, 438 F.3d at 221 (internal quotation marks omitted).

"While the plaintiffs here did not allege a specific damages amount, that is not fatal to their jurisdictional claim." *Bigsby*, 170 F. Supp. 3d at 579. Here, Plaintiffs allege that Defendants service approximately 2.3 million loans totaling $500 billion, (AC ¶ 2), and that the class – although its exact size is unknown – is likely comprised of thousands of individuals across the country, (*id.* ¶ 41). They provide no facts regarding what percentage of these individuals reside in New York. They seek actual damages –property inspection fees ranging from $15-20, and "other fees" ranging from $125-275 – statutory damages, punitive damages, plus interest and attorneys' fees and costs pursuant. (*See id.* ¶ 123; *id.* at 24-25.)

Many cases state that a plaintiff can meet his burden of showing a reasonable probability that the jurisdictional amount is met through a rebuttable presumption arising from the face of the complaint, but they rely on precedent that predates *Iqbal* and *Twombly*. *See, e.g.*, *Hart*, 967 F. Supp. 2d at 961 (relying on *Blockbuster*, 472 F.3d 53, and *Colavito*, 438 F.3d 214). It seems to me that the jurisdictional amount, like any other factual allegation, ought not to receive the presumption of truth unless it is supported by facts rendering it plausible. *See Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155 (D. Conn. 2016) (plausibility standard "should . . . equally govern the evaluation of factual allegations that support federal subject matter jurisdiction, [including] the amount in controversy"); *Wood v. Maguire Auto. LLC*, No. 09-CV-0640, 2011 WL 4478485, at *2 (N.D.N.Y. Sept. 26, 2011) ("[T]his face-of-the-complaint presumption is available only if the face of the complaint alleges facts plausibly suggesting the existence of claims aggregating over the jurisdictional minimum amount in controversy."), *aff'd*, 508 F. App'x 65 (2d Cir. 2013) (summary order) ("Wood's allegation in her complaint of

$75,000 in controversy is conclusory and not entitled to a presumption of truth.") (citing *Iqbal*, 556 U.S. at 681); *id.* ("[I]in the event the complaint does not allege, on its face, facts plausibly suggesting that the amount in controversy exceeds the jurisdictional minimum, the court need not presume that the general allegation that the amount in controversy exceeds the jurisdictional minimum constitutes a good faith representation of the actual amount in controversy.").

Here Plaintiffs have not plausibly alleged that $5 million is in controversy. They allege that Defendants service approximately 2.3 million loans, and that at least thousands of those loans are in default. If just three percent of those 2.3 million loans were in default, and the borrowers were charged property inspection fees of $16 only five times, the amount in controversy would exceed $5 million. But they have provided no information on what percentage of those borrowers are in New York and eligible to pursue the state-law claims alleged.[14] Nor have they provided information on how many times or how frequently they or other class members were charged the challenged fees.[15] So there are insufficient facts to render it plausible that the state law claims involve an amount in controversy exceeding $5 million. Accordingly, I believe the Court lacks subject-matter jurisdiction over those claims. And I decline to exercise supplemental jurisdiction over them.

In an excess of caution, however, and because the Second Circuit has not overruled its pre-*Twombly* rulings regarding the presumption to be afforded the face of the complaint, and the

---

[14] Plaintiffs have not brought claims under the consumer protection statutes of any state other than New York, and while they do not appear to rely on any particular state law in pursuing their unjust enrichment claim, I assume they mean to bring it under New York law because the named Plaintiffs are citizens of New York. (AC ¶¶ 13, 20.)

[15] At the same time, Defendants, in arguing that each individual's claim is worth $16, overlooks the fact that many borrowers are in default for months or years on end, and because the inspections are alleged to be ordered "automatically . . . on a cyclical basis," (*id.* ¶ 33), many borrowers are likely to have the fee imposed more than once. But because the cycle is not described, I cannot determine the number of times the fees were imposed.

need for the opposing party to show to a legal certainty that the jurisdictional amount cannot be met, I consider in the alternative the merits of the motion to dismiss the state claims.

### 2. N.Y. G.B.L. § 349(a)

To state a claim under N.Y. G.B.L. § 349, "a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009); *see Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (1995). Defendants argue that Plaintiffs fail to meet the first two requirements. (Ds' Mem. at 21-23.)

### a. Consumer Oriented

With respect to the first element, "[c]onsumer-oriented" does not mean that "the defendant committed the complained-of acts repeatedly – either to the same plaintiff or to other consumers – but instead . . . that the acts or practices have a broader impact on consumers at large." *Oswego*, 647 N.E.2d at 744. Courts have repeatedly held that a § 349 consumer "is one who purchase[s] goods and services for personal, family or household use." *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 448 (S.D.N.Y. 2004) (alteration in original) (internal quotation marks omitted); *see Cruz v. NYNEX Info. Res.*, 703 N.Y.S.2d 103, 106 (1st Dep't 2000) ("In New York law, the term 'consumer' is consistently associated with an individual or natural person who purchases goods, services or property primarily for 'personal, family or household purposes.'"). "'Consumer-oriented' has been defined in this circuit as 'conduct that potentially affects similarly situated consumers.'" *Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 449 (E.D.N.Y. 2013) (quoting *SQKFC, Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996)). "Based on this

standard, courts have found sufficient allegations of injury to the public interest where plaintiffs plead repeated acts of deception directed at a broad group of individuals." *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (collecting cases).

Defendants argue that because the Weir Plaintiffs and Stasul/Jorge Plaintiffs have different mortgage agreements, their claims are more akin to private contract disputes, which "'would not fall within the ambit of the statute.'" (Ds' Mem. at 23 (quoting *Oswego*, 647 N.E.2d at 744).) But Plaintiffs plead that all class members have been subjected to similar deceptive conduct in that they all have been charged for unreasonable property inspection fees or other fees. Regardless of the differing nature of the Plaintiffs' Security Instruments, "[i]t is alleged that all [mortgagors] would be subject to the same practices and policies" of charging for unreasonable property inspections. *White v. Fein, Such & Crane, LLP*, No. 15-CV-438, 2015 WL 6455142, at *6 (W.D.N.Y. Oct. 26, 2015) (denying motion to dismiss § 349 claim because even though defendant entered into private settlement agreements with plaintiffs, defendants were alleged to subject plaintiffs to same policies and practices across class); *Kapsis*, 923 F. Supp. 2d at 450 (denying motion to dismiss § 349 claim because plaintiff had alleged defendant engaged in deceptive practices directed at large class of similarly situated debtors); *cf. N.Y.U. v. Cont'l Ins. Co.*, 662 N.E.2d 763 (1995) (conduct not consumer-oriented because parties entered into non-standard policy "tailored to meet the purchaser's wishes and requirements" where purchaser was sophisticated and the agreement was heavily negotiated). Thus, at this stage, Plaintiffs have plausibly pleaded that Defendants' actions were consumer-oriented.

         *b.*    *Deceptive Practice*

"Deceptive practices are acts which are dishonest or misleading in a material respect" and "are defined objectively as acts likely to mislead a reasonable consumer acting reasonably under

the circumstances." *Spagnola*, 574 F.3d at 74 (alteration and internal quotation marks omitted). "[A] GBL § 349 claim does not lie when the alleged deceptive practice . . . was a matter explicitly disclosed in and permitted under . . . [a] written agreement." *Tardibuono-Quigley*, 2017 WL 1216925, at *15 (alterations in original) (internal quotation marks omitted).

Defendants argue that Plaintiffs' § 349(a) claim fails because they failed to plausibly plead a deceptive practice for essentially the same reasons as their RICO and FDCPA claims fail. (Ds' Mem. at 22.) I agree. As previously discussed, *supra* Section III.B, Plaintiffs were charged for property inspections and other fees, which were represented as such on their billing statements. "[A] party does not violate GBL [§] 349 by simply publishing truthful information and allowing consumers to make their own assumptions about the nature of the information." *Gomez-Jimenez v. N.Y. Law Sch.*, 956 N.Y.S.2d 54, 59 (1st Dep't 2012); *see Tardibuono-Quigley*, 2017 WL 1216925, at *15 (dismissing § 349 claims brought under theory that billing statements failed to indicate property inspection charges were unreasonable under mortgage agreements); *Hines v. Overstock.com, Inc.*, No. 09-CV-991, 2013 WL 4495667, at *9 (E.D.N.Y. Aug. 19, 2013) ("New York courts have dismissed claims for having failed to satisfy this element where a defendant fully disclosed the terms and conditions of an alleged deceptive transaction that caused harm to the plaintiff."); *Shovak v. Long Island Commercial Bank*, 858 N.Y.S.2d 660, 662-63 (2d Dep't 2008) (dismissing § 349 claim because charges, which were not *per se* illegal, were fully disclosed to plaintiff).

Plaintiffs rely on *Bauer v. Mellon Mortg. Co.*, 680 N.Y.S.2d 397 (Sup. Ct. N.Y. Cty. 1998), *aff'd*, *Walts v. First Union Mortg. Corp.*, 686 N.Y.S.2d 428 (1st Dep't 1999), to argue that Defendants' failure to disclose that the fees were unreasonable is a deceptive practice under § 349. In *Bauer*, the court considered the conflict between a mortgage servicer's charges to

mortgagors for private mortgage insurance ("PMI") and a state law regulating when a lender may charge PMI. *Id.* at 398-99. Under New York law, "a lender may not require a mortgagor to purchase private mortgage insurance . . . from an insurer designated by the lender, when the unpaid principal loan amount represents 75% or less of the property's appraised value." *Id.* But defendants there – mortgage servicers – did not notify plaintiffs when their unpaid principal balance fell below this threshold set by state law, and continued to charge them for PMI. *Id.* at 399. The court held because defendants charged plaintiffs for fees that were plainly illegal under state law, plaintiffs had stated a claim under § 349. *Id.* at 401.

Here, however, Plaintiffs are not arguing that the property inspection fees were *per se* illegal under a state or federal law; rather, they posit that the charges for property inspection fees are unreasonable under their contracts.[16] Federal courts have made a distinction between charges that are themselves illegal under state or federal law and those that may be unreasonable under a contract in determining whether a mortgage servicer's actions were deceptive under § 349. *See, e.g.*, *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 645, 659 (E.D.N.Y. 2012) (charging allegedly unreasonable property inspection fees not deceptive under § 349 because not violative of state or federal law and mortgage agreement put no limitation other than reasonableness requirement on default-related servicing fees); *Lum v. New Century Mortg. Corp.*, 800 N.Y.S.2d 408, 410 (2d Dep't 2005) ("no materially misleading statement [where fee,] which [was] not per se illegal, was disclosed to the plaintiff"); *cf. Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126-27 (2d Cir. 2007) (allowing § 349 claim to proceed where fees alleged to violate substantive law). Thus, without any plausible allegations that the

_____

[16] While Plaintiffs argue that the unreasonable fees, along with other facts, add up to a violation of RICO, RESPA, and the FDCPA (an argument I have rejected), they do not argue that any statute explicitly outlaws such fees.

property inspection fees were *per se* illegal under some statute, and for the same reasons that Plaintiffs failed to plausibly plead a misrepresentation under RICO or a false representation under the FDCPA, Plaintiffs have failed to plausibly plead a deceptive practice under N.Y. G.B.L. § 349(a).[17]  Accordingly, if I had subject matter jurisdiction, I would dismiss the § 349 claim.

### 3.    Unjust Enrichment

To state a claim for unjust enrichment under New York law, Plaintiffs must show that "(1) the defendant was enriched; (2) at the expense of the plaintiff; and (3) that it would be inequitable to permit the defendant to retain that which is claimed by Plaintiff." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 524 (S.D.N.Y. 2015).  "Unjust enrichment is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Mahoney v. Endo Health Sols., Inc.*, No. 15-CV-9841, 2016 WL 3951185, at *11 (S.D.N.Y. July 20, 2016) (internal quotation marks omitted).  "When a valid, enforceable contract exists, courts dismiss unjust enrichment claims because the parties' relationship is said

---

[17] There perhaps could be an argument that the Security Instruments themselves violate N.Y. G.B.L. § 349 because a reasonable mortgagor may decide to enter into a mortgage agreement like those here, believing that lenders would only perform *reasonable* property inspections, and that the inspections for which Plaintiffs were charged – generated by a computer program – were unreasonable.  *See Tardibuono-Quigley*, 2017 WL 1216925, at *16.  In other words, Plaintiffs might arguably claim they were tricked into entering the agreements.  But Defendants here did not sign the Security Instruments and were not otherwise involved in Plaintiffs' decisions to enter into them.  The Weir Plaintiffs' Security Instrument was between the Weirs and National City Mortgage, a division of National City Bank, (Howard Decl. Ex. A at 2), and the Stasul/Jorge Plaintiffs' Security Instrument was between Stasul, Jorge, and 1st Alliance Lending, LLC, (*id.* Ex. B at 2).  Thus, Plaintiffs could not sustain a claim against the named Defendants because Plaintiffs failed to allege Defendants "had any role in the events surrounding Plaintiff[s'] decision to enter into the" Security Instruments.  *Tardibuono-Quigley*, 2017 WL 1216925, at *16.

to be governed by the terms of the contract." *Tardibuono-Quigley*, 2017 WL 1216925, at *19 (collecting cases).

Defendants argue that the mortgage agreements govern the same subject matter as Plaintiffs' unjust enrichment. Plaintiffs disagree and rely on *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practice Litig.*, 601 F. Supp. 2d 1201 (S.D. Cal. 2009), where the court held that an unjust enrichment claim could proceed because the plaintiffs alleged that defendants "engaged in a scheme to steer borrowers into subprime mortgages, which were then sold as investments in the secondary mortgage market." *Id.* at 1207. The scheme alleged in *Countrywide* went beyond the terms of the mortgage agreements. Here, there is no dispute that the Security Instruments address property inspection and other fees that arise in the event of default. Indeed, Plaintiffs' "unjust enrichment claims are based exclusively on whether [Defendants] violated contractual terms regarding assessment of property inspection fees." *Ellis v. J.P. Morgan Chase & Co.*, No. 12-CV-3897, 2016 WL 5815733, at *10 n.11 (N.D. Cal. Oct. 5, 2016). Plaintiffs fail to explain how the unjust enrichment claim falls outside the confines of their Security Agreements. *Benner*, 917 F. Supp. 2d at 361 ("The agreement addresses numerous topics, including Defendant's ability to charge for property inspections if Plaintiff defaults – as he admittedly did – on his mortgage payments. Plaintiff has a right, of course, to challenge the reasonableness of those charges, but a theory of unjust enrichment is not the proper legal vehicle."); *Tardibuono-Quigley*, 2017 WL 1216925, at *19 (dismissing unjust enrichment claim because mortgage agreements governed dispute); *Ellis*, 2016 WL 5815733, at *11 (same). Further, Plaintiffs have not alleged that they actually paid the fees or facts rendering it plausible that any such fees were retained by the servicer Defendants, as opposed to the lenders.[18]

---

[18] The original Security Instruments were between Plaintiffs and other lenders. It could be – although it is not alleged – that at some point the original lenders assigned their rights to Defendants. This has been true in other

Therefore, if I had subject matter jurisdiction, I would dismiss Plaintiffs' unjust enrichment claim.

## IV.     LEAVE TO AMEND

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already amended their complaint, (Doc. 14), after having the benefit of a pre-motion letter outlining the majority of Defendants' proposed grounds for dismissal, (Doc. 10), and my observations during the April 17, 2017 conference. Plaintiffs' failure to fix deficiencies in the previous pleadings, after being provided notice of them, is alone sufficient grounds to deny leave to amend. *See In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the

---

cases where courts have dismissed unjust enrichment claims against servicers because a contract existed between the plaintiffs and the original lender and was later assigned to defendant servicer, even though the named defendant was not a party to the original mortgage agreement. *See Ellis*, 2016 WL 5815733, at *4 (loan originated with Washington Mutual and was eventually assigned to defendant); *Benner*, 917 F. Supp. 2d at 345-46 (loan refinanced with Allied Mortgage Group and later assigned to defendant). If this is not the case here, however, and Defendants are acting as servicers who assist with management of the mortgages but do not receive the actual fees paid by mortgagors, Defendants have not been enriched. In either situation, Plaintiffs have failed to plausibly plead an unjust enrichment claim against Defendants.

defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Further, Plaintiffs have not sought to amend again or otherwise suggested that they possess facts that would cure the deficiencies identified in this opinion. Accordingly, the Court will not grant leave to amend *sua sponte*. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where "request gives no clue as to how the complaint's defects would be cured") (internal quotation marks omitted).

------------------

Plaintiffs are attempting to hold Defendants liable under federal law when the gravamen of the complaint is breach of contract. *See, e.g.*, *Tardibuono-Quigley*, 2017 WL 1216925, at *11 ("[I]f Defendants charged for un[reasonable] services, they could be deemed to be in breach of the Security Agreement," but "a breach of contract normally does not constitute the predicate act of mail or wire fraud, or any predicate act for that matter."). Defendants state in a footnote that "[w]ere Plaintiffs to plead breach of contract, these claims would likewise fail because such

34

inspections are authorized by the Mortgages." (Ds' Mem. at 9 n.3.) I am not sure that the relevant contracts authorize passing on to borrowers the costs of periodic inspections if, as Plaintiffs allege, those inspections serve no purpose. And it can be a harsh, and perhaps counter-productive, practice. But Plaintiffs did not bring a breach of contract claim, nor did they bring claims against the entities with whom Plaintiffs entered into their Security Instruments. Thus, on the theories alleged in the Amended Complaint, Plaintiffs cannot sustain claims against Defendants.

## V.     CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 20), and close the case.

**SO ORDERED**

Dated: July 17, 2018
         White Plains, New York

_____
         CATHY SEIBEL, U.S.D.J.